**BIC CORPORATION, Plaintiff,**

v.

**UNITED STATES of America, and the U.S. International Trade Commission, Defendants,**

and

**Thai Merry Co., Ltd., Defendant-Intervenor,**

and

**New York Lighter Co., Inc. and Polycity Industrial Ltd., Defendants-Intervenors.**

Slip Op. 97–51.
Court No. 95–05–00726.

United States Court of International Trade.

April 24, 1997.

Collier, Shannon, Rill & Scott (Paul C. Rosenthal, Robin H. Gilbert, Lynn E. Duffy, and Laura A. Svat), Washington, DC, for plaintiff.

Lyn M. Schlitt, General Counsel, James A. Toupin, Deputy General Counsel, Office of General Counsel United States International Trade Commission (Anjali K. Hansen, Shara L. Aranoff, and Rhonda M. Hughes), Washington, DC, for defendant.

Willkie Farr & Gallagher (Kenneth J. Pierce, Washington, DC, William B. Lindsey, Chevy Chase, MD, and Matthew R. Nicely, Washington, DC), for defendant-intervenor Thai Merry Co.

Pepper, Hamilton & Scheetz (Elliot J. Feldman, Washington, DC, and John J. Burke), for defendants-intervenors New York Lighter Co.; and Polycity Industrial Ltd.

## *OPINION*

GOLDBERG, Judge:

This matter is before the Court on plaintiff's motion for judgment on the agency record and request for remand. Plaintiff, BIC Corporation, Milford Connecticut, ("BIC"), challenges the United States International Trade Commission's ("Commission") final negative material injury determinations with respect to certain disposable lighters from Thailand and the People's Republic of China ("China"). *Disposable Lighters from Thailand,* USITC Pub. No. 2876, Inv. No. 731–TA–701 (Apr.1995) (final negative determination), 60 Fed.Reg. 21,007 (1995) (*"Thai Lighters"*); and *Disposable Lighters from the People's Republic of China,* USITC Pub. No. 2896, Inv. No. 731–TA–700 (June 1995) (final negative determination), 60 Fed.Reg. 32,338 (1995) (*"Chinese Lighters"*). The Court exercises jurisdiction under 28 U.S.C. § 1581(c) (1994), and affirms the Commission's final determinations.

## BACKGROUND

### I. The Antidumping Petition:

On May 9, 1994, BIC, the sole domestic producer of disposable lighters, filed a petition with the Commission and Commerce alleging that the United States's ("U.S.") disposable lighter industry was materially injured, or threatened with material injury, by reason of subsidized and less than fair value ("LTFV") imports of disposable pocket lighters from Thailand, and LTFV imports of disposable lighters from China. *Disposable Lighters from the People's Republic of China and Thailand,* 59 Fed.Reg. 25,502 (1994). *Thai Lighters* at I–8.

In April 1995, the ITC reached a final negative determination with respect to disposable lighters from Thailand. *Thai Lighters.* Two months later, the Commission reached a final negative determination with respect to disposable lighters from China. *Chinese Lighters.*

### II. The Commission's Determinations:

The Commission's determination in *Chinese Lighters* parallels its determination in *Thai Lighters.* That is, in *Chinese Lighters,* the Commission adopted and incorporated by reference the conditions of competition and the discussion of the domestic industry contained in *Thai Lighters.*[1] *Chinese Lighters* at I–7, I–9. The only significant difference involves cumulation. In *Thai Lighters,* the Commission analyzed material injury cumulating imports from both Thailand and China. *Thai Lighters* at I–11–I–13. In contrast, a majority of the Commission in *Chinese Lighters* decided not to cumulate imports from China with imports from Thailand because it found that the Thai imports were no longer subject to investigation. *Chinese Lighters* at I–7, I–11.

In both determinations, the Commission found one like product, consisting of both standard and child-resistant disposable lighters. *Thai Lighters* at I–6.

The Commission then examined the state of the domestic industry. It began by identi-

fying two conditions of competition which provided the context for its assessment of the economic health of the domestic disposable lighter industry. The first condition of competition was a new regulation promulgated by the Consumer Product Safety Commission ("CPSC"), banning both the manufacture or importation of non-child-resistant lighters ("standard lighters") after July 12, 1994. *Id.* at I–9. The Commission determined that the ban forced the industry to undergo a "fundamental" structural change, affecting the investigation in three ways: first, it forced many suppliers to exit the U.S. market because they could not supply disposable lighters that complied with the CPSC regulation; second, it led to the buildup of U.S. inventories of domestic and imported standard lighters; and third, it complicated the use of 1994 market data. *Id.*

The second condition of competition involved a finding that the disposable lighter market consists of two primary market segments, one containing "higher-priced, higher-quality, brand name disposable lighters," and the other containing "lower-priced, lower-quality private label brands." *Id.* The Commission further found that BIC's lighters were sold in the higher-quality segment, while the subject imports were sold in the lower-quality segment. *Id.*

Against this backdrop, the Commission then discussed the state of the domestic industry. The Commission found that between 1991 and 1994, the cumulated volume of subject imports increased, and BIC's market share by quantity decreased slightly. *Thai Lighters* at I–14–I–15. Importantly, the Commission also found that any negative inferences this data might raise were offset by increased domestic consumption of lighters during the same period. *Id.* Moreover, when it measured market share by value, the Commission found that BIC's market share actually increased from 1992 to 1994. *Id.* at I–15. Additionally, in the post-CPSC ban period, the Commission found that BIC's market share increased whether measured by quantity or value. *Id.*

---

1. As a result, unless otherwise specified, all references to the Commission's discussion in *Thai Lighters* also incorporate *Chinese Lighters.*

The Commission then found that the two products competed on factors other than price. *Id.* at I–15–I–16. Consequently, the Commission concluded that "[t]he domestic industry retained a relatively stable share (by value) of a growing market, and was profitable throughout most of the period of investigation, even though domestic production decreased." *Thai Lighters* at I–17 (footnotes omitted). As a result, the Commission unanimously determined that the domestic industry was not experiencing material injury by reason of the LTFV imports from Thailand and China.

The Commission then turned to the question of whether the subject imports threatened the domestic industry with material injury. A majority of the Commission first concluded that after the CPSC ban, "only the Thai and Chinese existing and future capacity to produce child-resistant lighters [would be] evidence of any threat of material injury to the domestic industry." *Id.* at I–20. It then found that, as a percentage of total capacity, the Thai and Chinese producers' capacity to produce child-resistant lighters was too small to pose a threat to BIC. *Id.* at I–20–I–21.

The majority further found that the administrative record did not contain any evidence indicating that the Thai and Chinese producers were "preparing to abandon [ ] other markets, which consume standard lighters, in order to ship more child-resistant lighters to the United States." *Id.* at I–21. As a result, the majority concluded that there was no evidence "that any threat of material injury [was] real or that actual injury [was] imminent."[2] *Id.*

## STANDARD OF REVIEW

The Court will uphold the Commission's determination unless it finds that it is "unsupported by substantial evidence on the record, or not otherwise in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1994). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (citations omitted).

To make this assessment, the Court reviews "all information presented to or obtained by the ... Commission during the course of the administrative proceeding...." 19 U.S.C. § 1516a(b)(2)(A)(I). Importantly, the Court may not remand the Commission's determination simply because the evidence on the record may support two inconsistent conclusions. *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026–27, 16 L.Ed.2d 131 (1966); *Matsushita Elec. Indus. Co. v. United States*, 3 Fed. Cir. (T) 44, 54, 750 F.2d 927, 936 (1984); *accord, Mitsubishi Materials Corp. v. United States*, 20 CIT ——, —— – ——, 918 F.Supp. 422, 424–25 (1996). Rather, the choice between two possible conclusions is properly the task of the Commission, and not the court. *Bando Chemical Indus. v. United States*, 17 CIT 798, 802–03 (1993), *aff'd*, 26 F.3d 139 (Fed. Cir.1994); *Acciai Speciali Terni S.p.A. v. United States*, 19 CIT ——, ——, Slip Op. 95–142 at 8–9, 1995 WL 476719 (Aug. 7, 1995). Thus, the Court affirms agency factual determinations so long as they are reasonable and supported by the record when considered as a whole, even though there may be evidence on the record which detracts from the agency's conclusions. *Atlantic Sugar, Ltd. v. United States*, 2 Fed. Cir. (T) 130, 137–38, 744 F.2d 1556, 1563 (1984).

## DISCUSSION

BIC challenges the Commission's negative current injury determinations and negative threat determinations in both *Thai Lighters* and *Chinese Lighters*. With respect to the current injury determinations, BIC argues that the Commission's causation analysis is not in accordance with law because it is internally inconsistent and it is unsupported

---

**2.** In *Thai Lighters*, Commissioner Lynn M. Bragg concurred with the majority but wrote separately to discuss her analysis. *Thai Lighters* at I–25–I–27. In both *Thai Lighters* and *Chinese Lighters*, Commissioners David B. Rohr and Don E. New- quist did not join the majority's determination because they determined that the domestic industry was threatened with material injury by reason of the subject imports. *See Thai Lighters* at I–29–I–37; and *Chinese Lighters* at I–21–I–28.

by substantial evidence on the record. BIC further asserts that the Commission ignored evidence of underselling, overstated the impact of the CPSC ban, and relied on flawed and unrepresentative data.

With respect to the threat determinations, BIC argues that the majority of the Commission ignored evidence of rapidly increasing subject imports, and evidence that Thai and Chinese producers planned to convert standard lighter capacity to child-resistant lighter capacity. BIC further asserts that the ITC ignored evidence of adverse price trends for child-resistant lighters, and growing inventories of subject lighters.

Finally, BIC asserts that the majority of the Commission erred in *Chinese Lighters* when it refused to cumulate imports from Thailand with imports from China. The Court will address each of these contentions in turn.

### I. The Commission's Current Injury Determinations:

### A. The Commission's Causation Analysis:

BIC attacks the Commission's causation analysis on two levels: one legal, the other factual. First, BIC argues that the Commission cannot legally justify its apparently inconsistent findings. BIC points out that the Commission found *sufficient fungibility* between the subject imports and BIC's lighters to support its finding of one like product, as well as its decision to cumulate. Yet, the Commission also found that there was *insufficient fungibility* between the two groups of lighters to negatively affect domestic prices and production. BIC asserts that such contradictory findings cannot pass legal muster. Second, BIC contends that substantial evidence on the record fails to support the division of the disposable lighter market into low- and high-end product lines. Thus, according to BIC, the Commission's causation analysis is unsupported by substantial evidence on the record because it is predicated on this division.

### 1. Whether the Commission's Causation Analysis is in Accordance with Law:

BIC asserts that "any evidence of competition between the imported and domestic like product" legally prevents the Commission from segmenting the domestic market when it assesses causation. *Pl.'s Br.* at 19. According to BIC, the Commission's finding of one like product and its decision to cumulate constitute such evidence of competition. *See Thai Lighters* at I–6, I–12–I–13. Relying on *Grupo Indus. Camesa v. United States,* 18 CIT 461, 853 F.Supp. 440 (1994), and *Encon Indus., Inc. v. United States,* 16 CIT 840 (1992), BIC then concludes that the Commission's causation analysis was not in accordance with law.

■ Plaintiff's arguments miss their mark: how the Commission analyzes competition in the contexts of like product and cumulation does not legally dictate how the Commission must analyze competition in the context of causation.

The Court initially notes that in previous determinations, the Commission has recognized market segments as a condition of competition, notwithstanding concurrent findings of a single like product. *See, e.g., Certain Calcium Aluminate Cement and Cement Clinker From France,* USITC Pub. No. 2772, at I–11, Inv. No. 731–TA–645 (May 1994) (final negative determination); *New Steel Rails From the United Kingdom,* USITC Pub. No. 2617, at 10, Inv. No. 731–TA–559 (Mar.1993) (final negative determination).

■ Importantly, "neither the governing statute nor its legislative history require the Commission to adopt any particular analysis when the market consists of several segments." *Copperweld Corp. v. United States,* 12 CIT 148, 162, 682 F.Supp. 552, 566 (1988). Hence, when it has reviewed determinations in which the Commission has considered using market segments, the court has deferred to the Commission's findings regarding the existence and importance of such segments. *See, e.g., Acciai Speciali,* 19 CIT at ——, Slip Op. 95–142 at 25–26 (upholding the Commission's decision not to invoke market segments in its causation analysis even though market segments were decisive in its cumulation analysis).

Indeed, BIC ignores previous cases in which the court has consistently recognized

that the Commission's inquiry into product substitutability, i.e, to what degree two or more products compete with each other, may differ according to context:

> Analysis of substitutability varies according to the context of its application. For the purposes of defining "like product" as described in 19 U.S.C. § 1677(10)(1988), it is not necessary that like products be completely substitutable, only that the like product be like, or in the absence of like, most similar in characteristics and uses. For purpose of cumulation, the analysis of substitutability is also not stringent, as only a reasonable overlap in competition is required where like product imports compete with each other and with like products of the domestic industry. In analysis of material injury, substitutability is one factor in the evaluation of volume and price.

*R-M Indus., Inc. v. United States,* 18 CIT 219, 226 n. 9, 848 F.Supp. 204, 210 n. 9 (1994) (citations omitted) (internal quotations omitted). *See also United States Steel Group–A Unit of USX Corp. v. United States,* 18 CIT 1190, 1216, 873 F.Supp. 673, 697 (1994); *Acciai Speciali,* 19 CIT at ——, Slip Op. 95–142 at 35 (citation omitted).

Moreover, contrary to BIC's contentions, neither *Grupo,* 18 CIT 461, 853 F.Supp. 440, nor *Encon,* 16 CIT 840, suggest that the Court should accord less deference to the Commission's determinations in the present case. In *Grupo,* the court evaluated whether substantial evidence supported the Commission's decision to reject market segments both as a condition of competition, and as a factor in its causation analysis. 18 CIT at 464–66, 853 F.Supp. at 443–45. The court affirmed the Commission's decisions because the Commission had made findings of a high degree of fungibility. 18 CIT at 465–66, 853 F.Supp. at 445. In the present case, there are no such findings. *Thai Lighters* at I–13 (noting that the evidence indicates that the subject imports and domestic product have "somewhat limited fungibility").

Likewise, *Encon* fails to support BIC's argument. On its facts, *Encon* is unlike the present case. In *Encon,* the court upheld an affirmative injury determination involving electric ceiling fans. 16 CIT at 840. The importer challenged the determination, arguing that the Commission should have determined "whether low-end imports injured a 'major portion' of the total domestic industry by examining the effects on individual producers." *Id.* Like the present case, the U.S. ceiling fan market consisted of both low- and high-end products. *Id.; Thai Lighters* at I–9. However, unlike the present case, in *Encon* the domestic industry consisted of *both* low- and high-end producers. 16 CIT at 840. Here, the Commission determined that BIC is the *sole* domestic producer of disposable lighters, and that it *only* produces high-end lighters. *Thai Lighters* at I–8–I–9. As a result, the only possible domestic like product were those produced by BIC.

Hence, the Court concludes that the Commission's findings regarding fungibility as they relate to like product, cumulation, and causation accord with law.

2. *Whether the Commission's Causation Analysis is Supported by Substantial Evidence on the Record:*

As a condition of competition, the Commission determined that the U.S. disposable lighter market consisted of two major market segments. Specifically, it found that higher-priced, higher-quality, brand name disposable lighters were concentrated at one end of the market, and that lower-priced, lower-quality private label disposable lighters were concentrated at the other. *Thai Lighters* at I–9. The Commission further found that BIC's lighters were in the higher-quality category, and that the subject imports were in the lower-quality category. *Id.*

BIC argues that substantial evidence on the record does not support these findings. BIC challenges these findings on three separate grounds. First, BIC contends that the Commission's market segment findings are based solely on quality differences, and that quality differences alone do not constitute substantial evidence "that products do not compete with each other." *Pl.'s Br.* at 24–25. Second, BIC argues that the evidence that the Commission relied on to support its like product and cumulation findings overwhelm the evidence that the Commission relied on

to support its causation findings. *Id.* at 26–31. Third, BIC claims that the Commission ignored other evidence on the record which suggested that the subject imports compete with BIC's lighters. *Id.* at 31–33. The Court is unpersuaded by these arguments and addresses each of them in turn.

(a) Quality Differences:

■ The Commission decided to discount evidence of underselling because it determined that the subject imports and the domestic products were concentrated in different segments of the disposable lighter market. *Thai Lighters* at I–15–I–16. In order to reach this decision, the Commission evaluated evidence that BIC's lighters have a reputation for quality and safety, and benefit from advertising, promotional support, and brand name recognition. *Id.* (citing *Conf. Staff Rpt.* at I–35, I–80, I–83–I–85; *Pub. Staff Rpt.* at II–17, II–29–II–31). The Commission also weighed the subject imports' features, such as shape, adjustable flame settings, and transparent fuel tanks, against BIC's greater fuel capacity and superior fuel efficiency. *Id.* The Commission further noted that, although two-thirds of responding purchasers stated that there were no significant quality differences between the subject imports and BIC, one-half of these purchasers nevertheless reported some quality differences. *Id.* at I–12 (citing *Conf. Staff Rpt.* at I–84–I–85; *Pub. Staff Rpt.* at II–31).

Based on evidence contained in the purchaser responses, the Commission found that factors other than price influenced 80% of the purchasers. These non-price factors include: product quality, supplier liability insurance, brand name recognition, credibility/reliability of supplier, customer preference, availability, incentives, packaging, supplier service, and support. *Conf. Staff Rpt.* at I–99; *Pub. Staff Rpt.* at II–35.

BIC claims that these findings do not support the Commission's negative injury determination because "competition exists between products of differing quality." *Pl.'s Br.* at 25. Yet, BIC forgets that the court does not require the Commission to find a total absence of competition between the domestic like product and the subject imports before it may discount evidence of underselling.

■ Instead, the court has consistently recognized that the Commission may discount evidence of underselling whenever it finds that the subject imports compete with the domestic like product on other factors besides price. *See General Motors Corp. v. United States*, 17 CIT 697, 706, 827 F.Supp. 774, 783–84 (1993); *R–M Indus.*, 18 CIT at 226–28, 848 F.Supp. at 210–11; *Gifford–Hill Cement Co. v. United States*, 9 CIT 357, 368–69, 615 F.Supp. 577, 586 (1985). As discussed *infra*, the Court finds that substantial evidence on the record supports the Commission's findings that non-price factors mitigated price competition.

(b) Evidence of Competition Incorporated into the Commission's Like Product and Cumulation Findings:

As previously noted, the Commission found sufficient fungibility between the subject imports and BIC's lighters to support its like product and cumulation findings. *Thai Lighters* at I–6, I–12–I–13. BIC now attempts to use these findings to impugn the Commission's causation analysis on an evidentiary level. According to BIC, the evidence on competition and fungibility which underpins the like product and cumulation findings is so strong that it should have resulted in an affirmative injury determination. *Pl.'s Br.* at 26–31.

■ Yet, this argument fails because BIC again overlooks the importance of context; like product, cumulation, and causation are functionally different inquiries because they serve different statutory purposes. *R–M Indus.*, 18 CIT at 226 n. 9, 848 F.Supp. at 210 n. 9. As a result, each inquiry requires a different level of fungibility. Hence, the record may contain substantial evidence that two products are fungible enough to support a finding in one context (e.g., one like product), but not in another (e.g., cumulation or causation). *Acciai Speciali*, 19 CIT at ——, Slip Op. 95–142 at 35; *Certain Steel Wire Rod from Brazil and Japan*, USITC Pub. No. 2761, at I–6–I–8, I–21–I–22, Inv. Nos.

731–TA–646 and 731–TA–648 (Mar.1994) (final negative determination) ("*Steel Wire Rod from Brazil and Japan*"). Such a situation does not necessarily render either of the two apparently inconsistent findings unsupported by substantial evidence.

■ More concretely, the purpose of the like product inquiry is to delimit the domestic industry that the Commission will examine in its material injury determination. S.Rep. No. 96–249 at 90–91 (1979), *reprinted in*, 1979 U.S.C.C.A.N. 381, 476–77. It is not unusual for the Commission to find one like product even though it includes individual products that either lack or have limited fungibility. *See Aramid Fiber Formed of Poly Para–Phenylene Terephthalamide From the Netherlands*, USITC Pub. No. 2783, at I–6–I–7, Inv. No. 731–TA–652 (June 1994) (final affirmative determination); *Steel Wire Rod from Brazil and Japan* at I–6–I–8; *Steel Wire Rope From The Republic of Korea and Mexico*, USITC Pub. No. 2613, at 9–10, Inv. Nos. 731–TA–546 and 731–TA–547 (Mar.1993) (final affirmative determination). Hence, a finding of one like product is not synonymous with a finding that two products are highly fungible. *Acciai Speciali*, 19 CIT at ——, Slip Op. 95–142 at 35 (citations omitted).

■ Likewise, cumulation does not require two products to be highly fungible. Rather, to support a decision to cumulate, the Commission need only find a "reasonable overlap" of competition between the subject imports, and between the subject imports and the domestic like product. *See, e.g., U.S. Steel Group*, 18 CIT at 1199–200, 873 F.Supp. at 685 (citations omitted). Fungibility is only *one* of four factors that the Commission considers when it decides whether a reasonable overlap of competition exists. *Czestochowa v. United States*, 19 CIT ——, ——, 890 F.Supp. 1053, 1062 (1995) (citations omitted). In this case, the Commission decided to cumulate despite its findings that the subject imports and the domestic product were only "somewhat fungible." *Thai Lighters* at I–13.

Nevertheless, BIC argues that other language in the cumulation discussion suggests that the subject imports and the domestic product are fungible. *Pl.'s Br.* at 29 (citing *Thai Lighters* at I–13). Importantly, however, fungibility plays a far more important role in the causation context than in either the like product or cumulation contexts; the more fungible two products are, the more likely underselling by one will affect the price of the other. *General Motors*, 17 CIT at 711–12, 827 F.Supp. at 787–88 (citing *Negev Phosphates, Ltd. v. U.S. Dep't of Commerce*, 12 CIT 1074, 1084, 699 F.Supp. 938, 947; H.R. Rep. 317, 96th Cong., 1st Sess. 46 (1979)).

■ Different features, consumer perceptions of quality and reliability, price differences, and brand loyalty all affect how fungible two products are, and hence, whether underselling by one product will suppress or depress the price of the other. *General Motors*, 17 CIT at 707–10, 827 F.Supp. at 784–87. In the present case, the Commission found that the subject imports did not depress the price of domestic lighters because the imported lighters did not enjoy the same brand name recognition, or reputation for quality and safety as BIC's lighters. *Thai Lighters* at I–15–I–16. *See also Disposable Lighters From the People's Republic of China and Thailand: Hearings Before the United States International Trade Commission* [hereinafter "*Hr'g Tr.*"] 127–29 (1995) (testimony of James Wilson). The Court concludes that these findings do not contradict the concurrent findings contained in the Commission's like product and cumulation discussions.

(c) Other Evidence on the Record:

Highlighting certain importer and purchaser questionnaire responses, BIC further argues that the Commission ignored evidence on the record indicating that the subject imports and BIC lighters are both comparable in quality and interchangeable. *Pl.'s Br.* at 31–33. The Court remains unpersuaded.

■ The inquiry into whether a set of products is comparable is a fact intensive one. *Iwatsu Electric Co. v. United States*, 15 CIT 44, 57, 758 F.Supp. 1506, 1517 (1991). Often, there may be substantial evidence on the record to support several inconsistent conclusions. *Metallverken Nederland B.V. v.*

*United States,* 13 CIT 1013, 1017, 728 F.Supp. 730, 734 (1989) (citing *Consolo,* 383 U.S. at 620, 86 S.Ct. at 1026–27; *Matsushita,* 3 Fed. Cir. (T) at 51, 750 F.2d at 933; *Negev Phosphates,* 12 CIT at 1076–77, 699 F.Supp. at 942; *Citrosuco Paulista, S.A. v. United States,* 12 CIT 1196, 1210, 704 F.Supp. 1075, 1088 (1988)). Consequently, because of its role as fact-finder, the Commission "has great latitude in making [these] finding[s]." *Iwatsu,* 15 CIT at 57, 758 F.Supp. at 1517. Hence, although BIC correctly notes that other evidence indicates that the subject imports compete with its products, the Court finds this evidence insufficient to render the Commission's determination unsupported by substantial evidence on the record.

The record reveals that purchasers infrequently change suppliers, and that many customers prefer BIC lighters because they enjoy a reputation for safety and a brand name recognition unmatched by the subject lighters. *See* List 2, Docs. 58.72, 58.74, 58.83, 58.87, 58.89, 58.98 (purchaser's questionnaire responses); *Final Econ. Mem.* at 21–23, List 2, Doc. 45; *Pub. Staff Rpt.* at II–30–II–31.

Furthermore, the majority of responding purchasers reported that the lowest priced lighters do not always win a contract or sale. *See* List 2, Docs. 58.72, 58.74, 58.83, 58.87, 58.89, 58.98 (purchaser's questionnaire responses); *Final Econ. Mem.* at 21–23. Instead, these purchasers evaluate the following non-price factors when they decide which lighters to purchase: product quality, supplier liability insurance, brand name recognition, the reliability of the supplier, customer preference, availability, incentives (e.g., advertising and free goods), packaging, and supplier service and support. *Id.*

Evidence in the record also indicates that, for the most part, subject imports and domestic lighters are not distributed through the same channels. Rather, the low-end imported lighters are more commonly sold to street vendors or "mom and pop" convenience stores, while BIC sells significantly more lighters to retail chains. *Hr'g Tr.* at 114 (testimony of John Norstrom); *Hr'g. Tr.* at 122 (testimony of John Tucker); *Hr'g Tr.* at 134 (testimony of Richard D. Boltuck).

Hence, the Court finds that, notwithstanding the questionnaire responses isolated by BIC, substantial evidence on the record supports the Commission's causation findings.

B. *The Commission's Underselling Analysis:*

When it assessed whether the subject imports caused material injury, the Commission decided to discount evidence that subject imports consistently undersold the domestic like product. *Thai Lighters* at I–16. BIC now challenges this aspect of the determination, arguing that "evidence of underselling is an indicator *per se* of injury by reason of subject imports." *Pl.'s Br.* at 35. According to BIC, once the Commission acknowledged that the subject imports undersold BIC's lighters, it was legally bound to make an affirmative injury determination unless it could quantify a price premium. The Court finds this analysis unpersuasive.

Evidence of underselling alone is legally insufficient to support an affirmative injury determination. Rather, the Commission has a statutory mandate to consider not only whether the subject imports have significantly undersold the domestic like product, but also how the subject imports affect the prices of the domestic like product. *See* 19 U.S.C. § 1677(7)(C)(iii). Interpreting this provision, the court has previously noted that Congress has vested the Commission with broad discretion to analyze and to assess the significance of all relevant factors in its injury determination. *USX Corp. v. United States,* 12 CIT 844, 846, 698 F.Supp. 234, 237 (1988) (citing *Copperweld,* 12 CIT at 156, 682 F.Supp. at 564; *Maine Potato Council v. United States,* 9 CIT 293, 300, 613 F.Supp. 1237, 1244 (1985)). *See also Trent Tube Div., Crucible Materials Corp. v. United States,* 14 CIT 386, 401–03, 741 F.Supp. 921, 934–35 (1990).

■■■ The Court now finds that the Commission permissibly exercised its discretion, and that substantial evidence on the record supports its decision to discount the evidence of underselling. First, the Commission explicitly considered evidence on the record regarding the margins of underselling. *Thai Lighters* at I–15.

Second, the Commission determined that the margins were consistent with its finding of no material injury because the subject imports and the domestic like product were concentrated in different market segments. In deciding to discount, the Commission noted that:

Standard lighters in the high-end segment typically range between 30 cents and 40 cents per lighter. Prices in the low-end segment vary from 10 cents to 20 cents per lighter. The disposable lighters selling at the high end [sic] of the market enjoy brand name recognition, as well as a reputation for quality and safety that is not characteristic of the lower-priced imports.... Purchasers agree that the primary advantage of the domestic product is its quality, brand name recognition and its advertising/promotional support. We discount the significance of underselling for these reasons.

*Thai Lighters* at I–15–I–16 (footnotes omitted).

The Court finds this explanation reasonable. As previously noted, different features, consumer perceptions of quality and reliability, price differences, and brand loyalty can all affect to what extent the price of the subject imports affects the price of the domestic like product. *General Motors,* 17 CIT at 707–10, 827 F.Supp. at 784–87. *See also R–M Indus.,* 18 CIT at 226–28, 848 F.Supp. at 210–11. Here, it was precisely these types of factors that the Commission weighed when it decided to discount evidence of underselling. *Thai Lighters* at I–15–I–16. Moreover, as discussed in the preceding subsection, the record supports the Commission's decision to evaluate these non-price factors. *See* List 2, Docs. 58.72, 58.74, 58.83, 58.87, 58.89, 58.98 (purchaser's questionnaire responses); *Final Econ. Mem.* at 21–23.

■ Third, contrary to BIC's contentions, the Commission was not required to quantify a price premium before it could discount the importance of the underselling margin. While BIC correctly notes that in *Canned Pineapple Fruit from Thailand,* USITC

Pub. No. 2907, Inv. No. 731–TA–706 (July 1995) (final affirmative determination) (*"Canned Pineapple"*), the Commission quantified price premiums when it evaluated the domestic canned pineapple market, neither agency practice nor case law compels it to do so in every investigation.[3] Instead, the court has previously upheld determinations in which the Commission has discounted evidence of underselling based on unquantified price premiums. *See Fresh Cut Roses From Colombia,* USITC Pub. No. 1575, at 9–10, Inv. No. 731–TA–148 (Sept.1984) (final negative determination), *aff'd, Roses, Inc. v. United States,* 13 CIT 662, 665–66, 720 F.Supp. 180, 183 (1989); *R–M Indus.,* 18 CIT at 226–28, 848 F.Supp. at 210–11.

Thus, in light of the foregoing, the Court upholds the Commission's underselling analysis because it is both in accordance with law and supported by substantial evidence.

### C. The Commission's Analysis of the CPSC Ban:

■ The Commission identified the CPSC's ban on standard lighters as a condition of competition because it concluded that the ban fundamentally altered the domestic disposable lighter market. *Thai Lighters* at I–9. BIC now challenges this conclusion, arguing that the Commission wrongly assumed both that the ban excluded subject imports from the U.S. market, and that the ban afforded BIC a competitive advantage. According to BIC, these flawed assumptions force this Court to find that the Commission's causation analysis is unsupported by substantial evidence on the record. *Pl.'s Br.* at 42–49. The Court disagrees.

BIC concedes that the Commission correctly found that the CPSC ban excluded many suppliers from the U.S. market. *See Pl.'s Br.* at 42; *Thai Lighters* at I–9 n. 37. However, according to BIC, these suppliers did not import or produce the majority of the subject lighters. As a result, BIC argues that the most important foreign suppliers

---

**3.** Note also that in *Canned Pineapple,* the Commission undertook a market segment analysis despite a concurrent finding of one like product,

consisting of domestic canned pineapple fruit. *Canned Pineapple* at I–7–I–8, I–13–I–14.

continued to participate in the U.S. market despite the ban. *Pl.'s Br.* at 42–46.

BIC's attack is without consequence. The record contains ample evidence that the ban decreased the number of suppliers who could ship to the U.S. *See* List 2, Docs. 58.23, 58.32, 58.38, 58.42, 58.49, 58.107 (importers' questionnaire responses); List 2, Docs. 58.61, 58.71 (purchasers' questionnaire responses). BIC has not adduced evidence that the remaining suppliers, albeit important ones, were capable of supplying enough child-resistant lighters to fully offset the effect of the ban on standard lighters. The Court concludes that substantial evidence on the record supports the Commission's finding that the ban had the immediate effect of decreasing the number of suppliers.[4]

The Court further concludes that substantial evidence on the record also supports the Commission's statement that "BIC [was] well-positioned to compete" in the post-ban domestic lighter market. *Thai Lighters* at I–19. This statement merely reflects the Commission's findings that in the second half of 1994, BIC's child-resistant lighters showed strong gains, including an improved operating income. *Id.* Because there is substantial evidence on the record to support these findings, *see Conf. Staff Rpt.* at A–11–12, the Court finds BIC's challenges to be without merit.

#### D. *The Commission's Use of Allegedly Flawed and Unrepresentative Data:*

BIC challenges how the Commission used data on two levels. First, BIC contends that the Commission failed to assess economic data for the entire period of investigation, and instead focused on data for the second half of 1994. Second, BIC contends that the Commission used inaccurate data for imports of child-resistant lighters. The Court rejects these contentions and addresses each in turn.

#### 1. *Full Period of Investigation and Half-Year Data:*

According to BIC, the Commission focused on post-CPSC ban trends while ignoring "the

transitory and unique nature of the period surrounding the ban." *Pl.'s Br.* at 50. The Court rejects this argument for two reasons.

First, the Commission explicitly stated that it considered data for the entire period of investigation. *See Thai Lighters* at I–9. In particular, the Commission focused on data for the years 1991 through 1994 when it evaluated market share, the volume of shipments, and price. *Id.* at I–14–I–17.

Second, the record demonstrates that the Commission parsed the 1994 data into pre- and post-ban periods precisely because it recognized that the ban caused market anomalies which rendered full year comparisons problematic. *Id.* at I–9, I–15, I–17–I–19. BIC now argues that despite its parsing of data, the Commission still failed to adequately account for the market anomalies. In particular, BIC contends that the Commission ignored how industry-wide pre-ban stockpiling of standard lighters distorted market share data for Chinese and all other disposable lighters both before and after the ban.

According to BIC, anticipation of the CPSC ban on standard lighters spawned a surge in imports of standard lighters. This surge, in turn, increased the apparent market share of imported lighters before the ban. Then, in the period immediately after the ban took effect, these same importers reduced their shipments of child-resistant lighters until the stockpiles of standard lighters were depleted. This, in turn, decreased apparent market share of imported lighters. As a result, according to BIC, when the Commission compared the imported lighter's pre-ban market share with their post-ban market share, the Commission overstated both the imported lighter's loss and BIC's gain in market share after the ban took effect. *Pl.'s Br.* at 51–54.

The record simply does not support BIC's contention. Rather, it reveals that the Commission was well aware that before the CPSC ban, both BIC and the foreign suppliers increased their inventories of standard light-

---

4. The Court discusses whether the Commission correctly assessed how the CPSC ban affected future foreign capacity *infra.*

ers. *See Thai Lighters* at I–9. BIC merely posits an alternative interpretation of the market share data in the pre- and post-ban periods. The fact that evidence on the record also supports this interpretation is "neither surprising nor persuasive." *Matsushita,* 3 Fed. Cir. (T) at 54, 750 F.2d at 936. It does not render the Commission's determinations invalid.

Furthermore, BIC's contention does not implicate the Commission's findings regarding the CPSC ban as they relate both to the number of foreign suppliers and to BIC's economic performance. As discussed in the preceding section, substantial evidence supports the Commission's findings that, as a result of the ban, fewer foreign suppliers could compete in the domestic lighter market. The record also supports the Commission's findings that BIC's operating income for standard lighters peaked in the first half of 1994, even though BIC's market share was at its lowest point during the entire period of investigation.

2. *Child-Resistant Lighter Import Data:*

■ BIC further attacks the Commission's use of 1994 import data for Chinese and "[o]ther [s]ource" lighters. *Pl.'s Br.* at 56–60. Both BIC and the Commission agree that questionnaire data for these importers was incomplete. *See Pl.'s Br.* at 57; *Conf. Staff Rpt.* at I–65. As a result, the Commission was forced to use import statistics provided by Commerce to calculate market share. However, because the import data did not delineate between standard and child-resistant lighters, the Commission was forced

to estimate what percentage of the imported lighters were standard and what percentage of the imported lighters were child-resistant. *Conf. Staff Rpt.* at I–65, I–73, Tbl. 3, source note.[5]

BIC argues that the Commission miscalculated the percentages for July 1994. BIC contends that because the ban on standard lighters did not take effect until July 12, 1994, there were "massive last minute entries" of standard lighters imported into the U.S. between July 1 and July 11, 1994, which distorted the relative market share data for standard and child-resistant lighters. *Pl.'s Br.* at 57. The Court rejects this argument.

■ The Court notes that because Congress has granted the Commission broad discretion to choose its methodology, it will not disturb the Commission's choice unless it is unreasonable. *Cemex, S.A. v. United States,* 16 CIT 251, 255–56, 790 F.Supp. 290, 294–95 (1992). BIC concedes that questionnaire data for these countries was inadequate, and that Commerce's import data did not disaggregate either by week or by type of lighter. *Pl.'s Br.* at 57. Under these circumstances, the Court finds that the Commission's methodology for allocating the lighters is reasonable.[6]

## II. *The Commission's Threat of Material Injury Determinations:*

After examining the statutory factors relevant to a threat investigation,[7] the majority of the Commission found that the subject imports did not threaten BIC with material

---

5. The Commission used two different methods to allocate imports to the categories of standard or child-resistant. If it had data available from importers' questionnaire responses, the Commission divided the imports for the second half of 1994 using a ratio of child-resistant to standard based on the questionnaire responses. Absent questionnaire responses, the Commission assigned all imports to the standard category for the years 1992 through June 1994, and to the child-resistant category for July–December 1994. *Conf. Staff Rpt.* at I–65.

6. Although BIC cites with approval to the methodology employed by Commissioner Crawford, *Pl.'s Br.* at 58–59, the Court finds it significant that Commissioner Crawford used it to reach a negative determination. *See Thai Lighters.*

7. These factors include: any existing unused production capacity, or an imminent, substantial increase in production capacity; a significant rate of increase of the volume or market penetration of imports which suggests that a substantial increase of imports is likely; whether the imports are entering the United States at prices which are likely to significantly depress or suppress the price of the domestic product; the inventory levels of the subject merchandise; and any potential for the subject importers to shift production away from other goods into the production of the subject imports. 19 U.S.C. § 1677(7)(F)(i).

injury. *Thai Lighters* at I–20–I–23. BIC attacks the majority's negative determination in four ways. First, it argues that the majority ignored evidence that, notwithstanding the CPSC ban, the number of subject imports were rapidly increasing. *Pl.'s Br.* at 61–64. Second, BIC argues that the majority wrongly assessed the subject importers' capacity to produce child-resistant lighters. *Id.* at 64–75. Third, BIC argues that the majority ignored record evidence on the price of the subject imports which BIC alleges indicates that the subject imports had the potential to depress or suppress the prices of its lighters. *Id.* at 75–78. Fourth, and finally, BIC argues that the majority ignored evidence that inventories of subject imports were high, and that they posed a threat of material injury to BIC. *Id.* at 78–80. The Court is unpersuaded by these challenges and addresses each of them in turn.

A. *Import Market Share Before and After the CPSC Ban:*

BIC argues that the Commission ignored two trends involving the level of subject imports: first, the subject imports' increased market penetration for *all* disposable lighters during the entire period of investigation; and second, the increased level of child-resistant subject lighters shipped after the ban. According to BIC, both trends indicate that the subject imports threaten it with material injury. *Pl.'s Br.* at 61–64.

■■■ However, the Court cannot agree with BIC that the majority of the Commission simply ignored the market penetration of all disposable lighters, including standard, over the entire period of investigation. Rather, the majority concluded that because the CPSC regulation banned the importation or production of standard lighters, "only . . . existing and future capacity to produce child-resistant lighters is evidence of any threat of material injury to the domestic industry." *Thai Lighters* at I–20. The Court finds this explanation reasonable.

Furthermore, the Court disagrees with BIC's interpretation of post-ban import data which, according to BIC, reveals exponential and threatening increases in shipments of subject child-resistant lighters. *Pl.'s Br.* at 62–63. The Court finds it is neither surprising, nor informative, that after the ban on standard lighters took effect, subject importers ceased shipping standard lighters and, instead, began shipping child-resistant lighters. This shift resulted in a dramatic increase in child-resistant lighter imports only because subject importers shipped negligible levels of child-resistant lighters before the ban. *Conf. Staff Rpt.* at D–11.

In addition, the increase of child-resistant lighter shipments alone fails to show how the number of child-resistant lighters shipped after the ban compares with the number of standard and child-resistant lighters shipped before the ban. Importantly, the majority found that "even if all child-resistant capacity [were] used to produce products shipped to the United States, fewer lighters could be shipped in terms of volume and market share" than prior to the ban. *Thai Lighters* at I–21. Against this backdrop, the Court finds that the majority's decision to focus on foreign capacity instead of import levels was entirely reasonable.

B. *Foreign Capacity to Produce Child–Resistant Lighters:*

BIC contends that the majority of the Commission underestimated the subject producers' capacity to ship child-resistant lighters because it ignored evidence that these producers could easily convert their production lines from standard lighters to child-resistant lighters, and because the majority ignored evidence that these producers intended to increase their production of child-resistant lighters. *Pl.'s Br.* at 64–75.

■■■■ Yet, BIC overlooks the relevant legal standard for threat determinations: the Commission may not make an affirmative threat determination unless there is evidence that the "threat of material injury is real and that actual injury is imminent." 19 U.S.C. § 1677(7)(F)(ii). Conjecture and speculation are not enough; there must be "positive evidence tending to show an intention to increase levels of importation." *Metallverken Nederland B.V. v. United States*, 14 CIT 481, 488, 744 F.Supp. 281, 287 (1990) (citations omitted). The Court concludes that the ma-

jority correctly applied this standard, and that BIC's contentions are, therefore, without merit.

Although the production process for standard and child-resistant lighters is basically the same, substantial evidence on the record supports the majority's finding that it "would be speculative" to conclude conversion of a large volume of standard lighter production capacity is imminent. *Thai Lighters* at I–7, I–21. Before a standard lighter producer can convert its facilities to child-resistant lighters, it must overcome a number of technical hurdles. It must create, patent, and test a new design. Next, it must obtain CPSC approval. Only then can it modify and retool equipment on the assembly line, and begin to produce, package, and market the new lighter. *Thai Lighters* at I–21 n. 145; *Hr'g Tr.* at 140 (testimony of Lindsay Meyer); *Hr'g Tr.* at 167 (testimony of Elliot Feldman). This process is both costly and time consuming. For instance, BIC spent seven years and approximately twenty-two million dollars to develop and manufacture its Child Guard Lighter. *See* List 2, Doc. 25 at Ex. 4, p. 4 (*Pre–Hr'g Br. for Thai Merry Co., Ltd.*) (excerpts from BIC Corp. Market Study, 1993). This suggests that conversion for many subject producers is not imminent.

In addition, BIC has not adduced evidence that those subject producers who already have the ability to produce child-resistant lighters intend to increase their production of these lighters. Instead, it merely asserts that several major subject producers ship child-resistant lighters to the United States, and that data on Chinese shipments of child-resistant lighters is incomplete. Neither of BIC's arguments merit a remand.

The majority clearly considered to what extent subject producers evidenced an intent to increase shipments to the United States. *Thai Lighters* at I–21. In so doing, it evaluated whether any evidence demonstrated that these producers were preparing to abandon other markets in order to increase their ability to produce child-resistant lighters. *Id.* In particular, it evaluated how Argentina's and the European Union's dumping findings against disposable lighters from China and Thailand would affect imports to the United States. *Id.* at I–22. Only then did it conclude that the record contained no evidence that "either conversion or certification is imminent." *Id.*

### C. Price of Subject Child–Resistant Lighter Imports:

BIC contends that the majority of the Commission ignored evidence that child-resistant lighters from Thailand and China undersold its child-resistant lighters, and that this evidence indicated that the subject imports "had and would continue to place dramatic downward price pressure on the U.S. market." *Pl.'s Br.* at 77. The Court disagrees.

Referencing the Commission's discussion of the effect of subject imports on domestic prices, the majority reiterated that the price of subject imports did not depress or suppress the price of BIC lighters. *Thai Lighters* at I–22. Hence, the majority did not ignore evidence of underselling, it merely discounted it. As discussed in the preceding section, the Court finds that the decision to discount this evidence is both in accordance with law and supported by substantial evidence on the record.

### D. Inventories of Subject Imports:

BIC argues that the majority ignored evidence indicating that inventories for subject lighters in general, and for child-resistant lighters in particular, increased over the period of investigation. *Pl.'s Br.* at 78–80. The Court disagrees.

Although BIC correctly points out that ultimately the majority chose not to evaluate inventory levels of *all* subject lighters over the entire period of investigation, the Court finds BIC's challenge immaterial. As discussed in subsection II–A, *supra*, the Court has already concluded that the majority's decision to focus solely on foreign capacity to ship child-resistant lighters is reasonable.

■ The Court also upholds the majority's decision to discount the importance of child-resistant lighter inventories. Before it made its negative threat determination, the majority assessed and weighed evidence on a number of factors, including child-resistant

inventory levels. *Thai Lighters* at I–20; 19 U.S.C. § 1677(7)(F)(I). It was only after this deliberative process that the majority decided that child-resistant lighter inventory levels alone did not support an affirmative threat determination. *Thai Lighters* at I–22.

Importantly, it is this deliberative process that the standard of review protects because "Congress has vested the Commission with broad discretion 'to make reasonable interpretations of the evidence and to determine the overall significance of *any particular factor* or piece of evidence.'" *Copperweld*, 12 CIT at 160, 682 F.Supp. at 564 (quoting *Maine Potato*, 9 CIT at 300, 613 F.Supp. at 1244) (emphasis added). *See also, Rhone Poulenc, S.A. v. United States*, 8 CIT 47, 52 n. 18, 592 F.Supp. 1318, 1324 n. 18 (1984); *Citrosuco Paulista*, 12 CIT 1196, 1225, 704 F.Supp. 1075, 1099 (1988). Thus, the Court only reviews whether there is substantial evidence on the record to support the majority's decision. *See Atlantic Sugar*, 2 Fed. Cir. (T) at 138, 744 F.2d at 1563; *Bando Chemical*, 17 CIT at 802–03.

The record demonstrates that in anticipation of the CPSC ban, most participants in the U.S. disposable lighter market stockpiled standard lighters. *See Hr'g Tr.* at 59 (testimony of Matthew T. McGrath). The record further reveals that many importers underestimated how long these stockpiles would last, and as a result, shipped too many child-resistant lighters. *Id.* at 124–25 (testimony of John Tucker). This explains why inventories of child-resistant lighters grew:

> Sales of child resistant lighters, through the end of '94, were moving slow [sic] because of those inventories from all different sources of standard lighters. Stan-

dard lighters are the preferred product. . . .

> The market indicates because of slowness of sales of child resistant [sic] lighters, that the market is still working off those inventories of standard lighters from subject and non-subject sources.

*Id.* at 171 (testimony of Kenneth J. Pierce).

Thus, the record suggests that inventory levels of child-resistant lighters reflected a "miscalculation of market conditions," *id.* at 124 (testimony of John Tucker), rather than a threat to BIC. This supports the majority's decision to discount the inventories of child-resistant lighters. Thus, the Court affirms the majority's decision to discount child-resistant inventory levels because it is both reasonable and supported by the record.

### III. Cumulation:

In *Chinese Lighters*, a majority of the Commission decided not to cumulate imports of Chinese disposable lighters with imports of Thai disposable lighters.[8] *Chinese Lighters* at I–7. When addressing current injury, the majority concluded that the mandatory cumulation provision contained in 19 U.S.C. § 1677(7)(C)(iv) was not controlling because imports from Thailand were no longer subject to investigation.[9] *Id.* at I–7 (citing *Chaparral Steel Co. v. United States*, 8 Fed. Cir. (T) 101, 109, 901 F.2d 1097, 1104–05 (1990)). Likewise, when addressing threat of injury, the majority declined to exercise their discretion to cumulate for the same reason.[10] *Chinese Lighters* at I–11 (citing 19 U.S.C. § 1677(7)(F)(iv)).

BIC argues that the Commission erred in both decisions. Specifically, BIC contends that the majority misapprehended the mean-

---

8. Vice Chair Janet A. Nuzman assessed the effects of the subject imports both on a cumulated and uncumulated basis before concluding that the record supports a negative determination in either framework. *Chinese Lighters* at I–17–I–20. Commissioner Newquist also decided to cumulate. *Chinese Lighters* at I–25–I–27.

9. Although investigations in *Thai Lighters* and *Chinese Lighters* began simultaneously, the Commission decided to stagger its final votes in *Thai Lighters* and *Chinese Lighters* because Commerce delayed its final LTFV determination for Chinese lighters. *Thai Lighters* at I–5 n. 4. As a result,

the Commission had already reached a negative determination in *Thai Lighters* when it voted in *Chinese Lighters*. *Chinese Lighters* at I–7. Thus, in *Chinese Lighters*, the majority concluded that the lighters from Thailand were no longer subject to investigation. *Id.*

10. The majority further noted that it "would [have] reach[ed] the same result had [it] cumulated subject imports from China with lighter imports from Thailand." *Chinese Lighters* at I–11 (citations omitted).

ing of "subject to investigation" in 19 U.S.C. § 1677(7)(C)(iv), and was therefore compelled to cumulate the Thai and Chinese imports. In the alternative, BIC contends that the majority should have cumulated the imports under the discretionary "recent order exception." *Pl.'s Br.* at 81–89. The Court disagrees and addresses each argument in turn below.[11]

A. *The Majority's Interpretation of "Subject to Investigation":*

▆▆ By statute, the Commission is required to:

cumulatively assess the volume and effect of imports from two or more countries of like products *subject to investigation* if such imports compete with each other and with like products of the domestic industry in the United States market.

19 U.S.C. § 1677(7)(C)(iv) (emphasis added). A majority of the Commission interpreted the phrase "subject to investigation" to exclude the Thai imports because the Commission had recently found that they did not cause material injury in *Thai Lighters*. *Chinese Lighters* at I–7. Notwithstanding BIC's many challenges, the Court upholds the majority's interpretation because it accords both with controlling case law and past agency practice.

In *Chaparral*, the Federal Circuit concluded that the phrase "subject to investigation" restricts those imports that may be cumulated to those that "are definitely determined to be dumped and to contribute to *present* material injury." 8 Fed. Cir (T) at 109, 901 F.2d at 1104. It then upheld as reasonable the Commission's decision to "evaluat[e] candidates for cumulation on the basis of their unfair trading or the effects of proven unfair trading as of vote day." *Chaparral*, 8 Fed. Cir. (T) at 111, 901 F.2d at 1105.

This is precisely what the majority did here. That is, the majority assessed whether

it should cumulate Thai imports with Chinese imports on vote day. *Chinese Lighters* at I–7. As noted previously, by vote day in *Chinese Lighters*, the Commission had already determined that the Thai imports did not contribute to present material injury. *See Thai Lighters.* Hence, drawing on *Chaparral*, the Commission concluded that cumulation was inappropriate. *Chinese Lighters* at I–7.

Moreover, this conclusion is consistent with past Commission determinations. *See Certain Cased Pencils from the People's Republic of China*, USITC Pub. No. 2837, at I–12, Inv. No. 731–TA–669 (Dec.1994) (final affirmative determination) (footnote omitted) ("[W]e have not cumulated cased pencil imports from China with imports from Thailand. . . . Imports from Thailand are no longer 'subject to investigation' as of vote day for this investigation because of the Commission's negative determination in *Certain Cased Pencils from Thailand.*"); *Sulfur Dyes From India*, USITC Pub. No. 2619, at 13, Inv. No. 731–TA–550 (Apr.1993) (final negative determination) ("Imports from China and the United Kingdom are no longer technically 'subject to investigation' because we previously reached negative final determinations with respect to those imports.") (*"Sulfur Dyes "*). The Court finds this analysis both reasonable and in accordance with law.

B. *The Recent Order Exception:*

▆▆▆ Even if cumulation is not mandated by statute, the Commission still has the discretionary authority to cumulate imports under the "recent order exception," because the Commission recognizes that "imports subject to a very recent order may continue to contribute an injury to the domestic industry, and are therefore properly cumulable." *Mitsubishi Materials Corp. v. United States*, 17 CIT 301, 314, 820 F.Supp.

---

**11.** The Court notes that after BIC filed the petition that initiated this case, Congress amended the controlling statute through the Uruguay Round Agreements Act. Trade and Tariff Act of 1984, Pub.L. No. 98–573, § 612(a)(2)(A), 98 Stat. 2948, 3033 (1984) (formerly codified at 19 U.S.C. § 1677(7)(G)(i) (1994)). It now provides that the Commission should cumulate imports from in-

vestigations that, although commenced simultaneously with the filing of a single petition, have become staggered. *See* 19 U.S.C. § 1677(7)(G)(i). Importantly, the amended statute does not govern in this case because the petition was filed before *its* enactment. Trade and Tariff Act of 1984, Pub.L. No. 98–573, § 612(a)(2)(A), 98 Stat. 2948, 3033.

608, 620 (1993). According to BIC, this exception should govern in the instant case, and the Court should remand. The Court cannot agree.

BIC misapprehends the nature and the scope of the exception. First, before the Commission can invoke the recent order exception, there must be a recent antidumping or countervailing duty order. *See Sulfur Dyes* at 13 n. 50; *Certain Stainless Steel Butt–Weld Pipe Fittings From Taiwan,* USITC Pub. No. 2641, at 7–8, Inv. No. 731–TA–564 (June 1993) (final affirmative determination). Given the negative determination in *Thai Lighters,* Thai imports were not subject to a recent antidumping order.

Second, even under the recent order exception, the determination must still contain findings "that imports from the candidate for cumulation were definitely determined ... to *contribute to present material injury.*" *Mitsubishi Materials,* 17 CIT at 315, 820 F.Supp. at 621–22 (internal quotations omitted) (quoting *Chaparral,* 8 Fed. Cir. (T) at 109, 901 F.2d at 1104) (alteration in original). Here, imports from Thailand were determined *not* to contribute to present material injury. *Thai Lighters* at I–17. Hence, the Court upholds the majority's decision not to invoke the recent order exception.

## CONCLUSION

The Commission's determinations regarding disposable lighters from Thailand and China are sustained because they are supported by substantial evidence and are otherwise in accordance with law.