**Slip Op. 03-32**

# UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                                                    :
CORUS STAAL BV and                                  :
CORUS STEEL USA, INC.,                              :
                                                    :
              Plaintiffs,                           :
                                                    :
        v.                                          :
                                                    :
UNITED STATES INTERNATIONAL TRADE                   :
COMMISSION,                                         :
                                                    :
              Defendant,                            :
                                                    :
        v.                                          :   Court No. 02-00002
                                                    :
BETHLEHEM STEEL CORPORATION,                        :   **Public Version**
NATIONAL STEEL CORPORATION, and                     :
UNITED STATES STEEL CORPORATION,                    :
                                                    :
              Defendant-Intervenors,                :
                                                    :
        v.                                          :
                                                    :
GALLATIN STEEL COMPANY,                             :
IPSCO STEEL INC., NUCOR CORPORATION,                :
and STEEL DYNAMICS, INC.,                           :
                                                    :
              Defendant-Intervenors.                :
_____:

[ITC's material injury determination sustained.]


                                        Dated: March 21, 2003


Steptoe & Johnson, LLP (Richard O. Cunningham, Joel D. Kaufman, Alice A. Kipel and Gregory S. McCue) for plaintiffs.

Lyn M. Schlitt, General Counsel, James M. Lyons, Deputy General Counsel, United States International Trade Commission (Mary Elizabeth Jones), for defendant.

Dewey Ballantine LLP (Alan Wm. Wolff and Kevin M. Dempsey) and Skadden, Arps, Slate Meagher & Flom LLP (Stephen Vaughn at oral argument; Robert E. Lighthizer, John J. Mangan and James C. Hecht on the brief) for defendant-intervenors Bethlehem Steel Corporation, National Steel Corporation, and United States Steel Corporation.

Schagrin and Associates (Roger B. Schagrin) for defendant-intervenors Gallatin Steel Company, IPSCO Steel Inc., Nucor Corporation, and Steel Dynamics, Inc.

**OPINION**

**Restani, Judge:**

Corus Staal BV and Corus Steel USA, Inc. (collectively "Corus"), respondents in an antidumping investigation before the United States International Trade Commission ("ITC" or "Commission"), move for judgment upon the agency record pursuant to USCIT Rule 56.2. Corus challenges several aspects of the ITC's final affirmative material injury determination in Hot Rolled Steel Products from China, India, Indonesia, Kazakhstan, The Netherlands, Romania, South Africa, Taiwan, Thailand, and Ukraine, 66 Fed. Reg. 57,482, USITC Pub. 3468, Inv. Nos. 701-TA-405-408 and 731-TA-899-904 and 906-908 (Nov. 2001) (final determ.) (adopting the factual findings and analysis of its determination in Hot Rolled Steel Products from Argentina and South Africa, 66 Fed. Reg. 46,026, USITC Pub. 3446, Inv. Nos. 701-TA-404 and 731-TA-898 and 905 (Aug. 2001) (final determ.)) [hereinafter "Final Determination"].[1]  Corus first claims that the Final Determination in the ITC's hot-rolled steel investigation is unsupported by substantial evidence in the administrative record.  Second, Corus challenges the Commission's

_____

[1] Citations to the Final Determination and Staff Report are to the confidential versions of those documents unless otherwise indicated.  The public versions of the Commission's opinion and Staff Report are contained in USITC Pub. 3446 (explaining the ITC's views in Hot Rolled Steel Products from Argentina and South Africa) and USITC Pub. 3468 (explaining background of the present investigations and adopting the views stated in Pub. 3446), and citations to the public documents contain the appropriate USITC publication number.

decision to cumulate Dutch imports with other subject imports on the grounds that subject imports from the Netherlands were not involved in a reasonable overlap of competition with other subject imports and with the domestic like product. Third, Corus argues that even if the ITC's decision to cumulate Dutch imports with other subject imports is supported by substantial evidence, the Commission erred in failing to individually assess whether Dutch imports were the cause of any material injury to the domestic industry.

## JURISDICTION AND STANDARD OF REVIEW

Jurisdiction is proper pursuant to 28 U.S.C. § 1581(c) (2000). The court upholds the ITC's findings and determinations in an antidumping investigation unless they are "unsupported by substantial evidence in the administrative record or [are] otherwise not in accordance with law." 19 U.S.C. § 1516(a)(2)(B)(i) (2000).

## FACTUAL AND PROCEDURAL BACKGROUND

The Commission initiated antidumping and countervailing duty investigations pursuant to petitions filed on November 13, 2000, by domestic steel producers[2] who alleged that an industry in the United States was materially injured or threatened with material injury by reason of imports of hot-rolled steel products that were either sold at less than fair value ("LTFV") or subsidized from Argentina, China, India, Indonesia, Kazakhstan, the Netherlands, Romania,

---

[2] The petitioners included Bethlehem Steel Corp., Gallatin Steel Co., IPSCO Steel, Inc., LTV Steel Co., National Steel Corp., Nucor Corp., Steel Dynamics, Inc., U.S. Steel Group of USX Corp., Weirton Steel Corp., and Weirton's Independent Steelworkers Union. Final Determination, USITC Pub. 3468, at 1. Weirton was not a petitioner in the investigation involving the Netherlands. Hot-Rolled Steel Products from Argentina, China, India, Indonesia, Kazakhstan, Netherlands, Romania, South Africa, Taiwan, Thailand, and Ukraine, 66 Fed. Reg. 805, 806 n.2 (ITC Jan. 4, 2001) (preliminary determ.) [hereinafter Preliminary Determination]. The remaining petitioners appear in the present action in support of the ITC's Final Determination.

South Africa, Taiwan, Thailand, and Ukraine. In its Preliminary Determination, the ITC found a reasonable indication that the domestic industry was materially injured by reason of subject imports. 66 Fed. Reg. at 805. A public hearing was held on July 17, 2001, during which the Commission heard testimony from the parties and industry representatives. See Tr. of Hr'g Before the ITC (July 17, 2001).

In August 2001, the Commission determined by a 6-0 vote that the domestic industry was materially injured by subsidized imports from Argentina and LTFV imports from Argentina and South Africa.[3] See Final Determination, USITC Pub. 3446, at 3. On August 30, 2001, the Commission issued the proprietary version of the Commission's views in the present case, adopting the findings and analysis from its determination with respect to imports from Argentina and South Africa.[4] See supra note 1 and accompanying text. Finding a reasonable overlap of competition among imports from each of the subject countries and between the subject imports and the domestic like product, the Commission cumulatively assessed the volume and price effects of subject imports in conducting its material injury analysis. See 19 U.S.C. § 1677(7)(G)(i) (2000). The Commission determined that the domestic hot-rolled steel industry

---

[3] The investigation of the Netherlands and other subject countries here arose out of a group of simultaneous petitions alleging subsidized and LTFV imports of hot-rolled steel from various countries. The ITC was required to issue its determination in the investigations of subsidized imports from Argentina and LTFV imports from Argentina and South Africa in August of 2001 because the Department of Commerce had issued its final determinations in those investigations earlier than it did in the remaining investigations. Final Determination, USITC Pub. 3468, at 3.

[4] Federal law requires the ITC to make its determinations in the instant investigations on the same record as the determinations regarding Argentina and South Africa, except that the present record also includes Commerce's final determinations in these investigations and the parties' final comments concerning the significance thereof. See 19 U.S.C. § 1677(7)(G)(iii); Final Determination, USITC Pub. 3468, at 3.

was materially injured by reason of cumulated subject imports, including imports from the Netherlands, that were sold in the United States at LTFV during the period of investigation ("POI").[5] Final Determination, USITC Pub. 3468, at 3.

Approximately two months after the Commission's confidential views were released, the Department of Commerce issued a revised, final weighted-average dumping margin for Dutch imports at 2.59 percent.[6] Notice of Amended Final Determination of Sales at Less Than Fair Value, 66 Fed. Reg. 55,637, 55,639 (Dep't Commerce Nov. 2, 2001). Later that month the Commission issued the public version of its Final Determination and Staff Report, which indicated that the revised dumping margins for the Netherlands and other subject countries did not alter its conclusion that the domestic hot-rolled steel industry was materially injured by reason of cumulated subject imports.[7] Final Determination, USITC Pub. 3468, at 3. Corus Staal BV, the only manufacturer and exporter of hot-rolled steel in the Netherlands, and Corus Steel USA, Inc., an importer of hot-rolled steel from the Netherlands, appeal the Commission's affirmative material injury determination.

_____

[5] The following countries' LTFV imports were included in the material injury determination: China, India, Indonesia, Kazakhstan, the Netherlands, Romania, Taiwan, Thailand, and Ukraine. The ITC also determined that the domestic industry was materially injured by reason of subsidized imports from India, Indonesia, South Africa, and Thailand. Final Determination, USITC Pub. 3468, at 3.

[6] The original weighted-average dumping margin for the Netherlands was 3.06 percent. Notice of Final Determination of Sales at Less Than Fair Value, 66 Fed. Reg. 50,408, 50,409 (Dep't Commerce Oct. 3, 2001).

[7] Commissioner Bragg specifically noted that she rarely considers the magnitude of the dumping margins to be significant in evaluating the effects of subject imports on the domestic industry. Final Determination, USITC Pub. 3468, at 3 n.4.

**DISCUSSION**

**I. MATERIAL INJURY DETERMINATION**

In the final phase of countervailing and antidumping duty investigations, the Commission determines whether an industry in the United States is materially injured by reason of the imports under investigation. See 19 U.S.C. § 1673d(b) (2000). The statutory definition of "material injury" is "harm which is not inconsequential, immaterial, or unimportant." 19 U.S.C. § 1677(7)(A) (2000). In making its material injury determination, the ITC must consider the volume of imports, their effect on prices for the domestic like product, and their impact on producers of the domestic like product in the context of U.S. production operations. Id. § 1677(7)(B). The Commission may also consider other relevant economic factors that bear on the state of the domestic industry. Id. This section first summarizes the Final Determination pursuant to the statutory standards and then addresses and analyzes Corus's arguments separately infra Part I.D.

**A. Volume**

In the first prong of the ITC's material injury analysis, the Commission must assess whether the volume of subject imports is "significant." 19 U.S.C. § 1677(7)(C)(i). In its Final Determination, the Commission found that subject import volume significantly increased throughout the POI despite declines in total apparent domestic consumption of hot-rolled steel.[8] Between 1998 and 1999, subject import volume increased by 122.7 percent; cumulated subject imports increased another 36.2 percent between 1999 and 2000. Although total shipments of the

_____

[8] The ITC noted that consumption fell in 1999, recovered somewhat in 2000, but remained at lower levels in 2000 than in 1998. Final Determination at 27 (citing Staff Report at Tables C-1 and C-2).

domestic like product rose by 4.8 percent between 1998 and 2000, domestic producers'

shipments to the merchant market declined between 1999 and the first half of 2000[9] while subject

import volume continued to increase, peaking in the second quarter of 2000. Based on the

coincidence of peak subject import levels and peak purchaser inventory levels of hot-rolled steel

during the first half of 2000, the Commission found that purchases of subject imports contributed

to the significant inventory build-up that occurred in that time frame. See infra n.14. The

Commission determined that the inventory build-up exerted downward pressure on orders for the

domestic like product through at least the first quarter of 2001. Finally, though subject import

volume subsequently declined, imports remained above pre-1999 levels until the first quarter of

2001, and the ITC found it likely that the filing of the antidumping petitions contributed to the

decline of subject import volume. Thus, the Commission concluded that subject import volume

was significant, both in absolute terms and relative to consumption in the United States. Final

Determination at 27–30.

## B. Price Effects

In evaluating the effects subject imports have on domestic prices, the ITC must consider

whether (1) there has been significant underselling by the imported merchandise compared with

prices for the domestic like product and (2) the imports have caused significant price depression

or suppression. 19 U.S.C. § 1677(7)(C)(ii). In discussing price trends for hot-rolled steel, the

Commission explained that domestic prices were at their highest levels for the POI in the first or

---

[9] In 1999, shipments of the domestic like product to the merchant market increased by 1.4 million short tons, compared to a 1.7 million short ton increase in the volume of subject imports. In 2000, domestic shipments fell by 106,804 short tons, while subject imports increased by another 1.1 million short tons. Id. at 28 (citing Staff Report at Tables IV-5 and IV-8).

second quarter of 1998, but then sharply dropped as unfairly traded imports from Brazil, Japan,

and Russia entered the market. In late 1999 and early 2000, prices began to rise after import

relief was granted against those imports, but domestic prices remained below 1998 peaks despite

increased apparent domestic consumption. Prices then fell sharply during the second half of

2000 and the first part of 2001, generally to lower levels than the industry had experienced prior

to the imposition of import relief with respect to imports from Brazil, Japan, and Russia. Final

Determination at 30 (citing Staff Report at Tables V-3–V-12).

Turning to the effect subject imports had on domestic prices, the Commission found that

subject imports consistently undersold the domestic like product throughout most of the POI.[10]

Underselling was particularly probative to the ITC in these investigations because low prices,

along with anticipated future demand, were an important factor in determining purchasing

decisions and inventory levels. Id. at 31 (citing Staff Report at V-11); see infra n.14. The

Commission found that underselling in late 1999 and the first half of 2000—at a time when

domestic prices and shipments were making a limited recovery after import relief was imposed

against nonsubject imports from Brazil, Japan, and Russia—significantly suppressed prices by

permitting limited price increases and sparked the significant growth in import volume that

occurred during that period.[11] See id. at 31–32.

---

[10] Id. at 31. Subject imports undersold the domestic like product in 64.7 percent of the
Commission's quarterly comparisons. Id. (citing Staff Report at Table V-13).

[11] The Commission considered, and rejected, the foreign producers' argument that one
cause of the price declines in 2000 was aggressive price competition by minimills at the expense
of the integrated mills, because product-specific pricing data showed that proposition to be
incorrect. In one high-volume product price comparison, minimill product [            ]
integrated mill product in the first half of 2000, and both integrated and minimill product were
[                                                    ] by combined subject imports during that period. Id. at

The ITC recognized that some overselling began to occur in the last two quarters of 2000, but the Commission rejected the notion that those instances of overselling indicated that the subject imports did not have a significant adverse effect on domestic prices. To the contrary, the domestic industry had already lost volume and sales in the first half of 2000 due to the significant increase in subject import volume, and domestic producers resorted to price cutting in an attempt to maintain production volume and market share. Id. at 31 (citing Staff Report at Table III-5; Hr'g Tr. at 57 (testimony of Mr. DiMicco)). The Commission also noted that the filing of the petition in late 2000 coincided with the instances of overselling. Finally, despite some overselling, subject imports continued to depress or suppress prices throughout the latter part of the POI by virtue of the inventory overhang to which the surge in subject imports in the first half of 2000 contributed. Id. Therefore, the Commission found that subject imports had significant adverse effects on domestic prices during the POI. Id. at 33.

## C. Impact

As noted above, the ITC considers all relevant economic factors that reflect the state of the domestic industry in examining the impact of subject LTFV imports. 19 U.S.C. § 1677(7)(C)(iii). These factors include, among other things, output, sales, inventories, capacity utilization, market share, employment, wages, productivity, profits, cash flow, return on investment, ability to raise capital, and research and development. Id. No single factor is outcome-determinative and all relevant factors are considered "within the context of the business

---

31–32 (citing INV-Y-148). Similar patterns emerged in other high-volume product-specific price comparisons. Thus, the Commission found no evidence that minimills initiated the price declines that emerged in 2000. To the contrary, the record indicated that the domestic hot-rolled steel industry reacted to the significantly increased volume of lower-priced imports by reducing prices. Id. at 32.

cycle and conditions of competition that are distinctive to the affected industry." 19 U.S.C. §
1677(7)(C)(iii).

In evaluating the impact of the subject imports, the Commission first noted that despite
certain positive indicators of the condition of the domestic industry from 1998 to
2000—capacity, production, capacity utilization, and commercial shipments all rose during this
period—the domestic industry's financial performance was poor throughout most of the POI.
Final Determination at 34 (citing Staff Report at Table III-3). In both 1999 and 2000, the
domestic industry experienced operating losses on its total production, commercial sales, internal
transfers, and related-party transfers. Id. (citing Staff Report at Tables VI-2, VI-5, and VI-5A).
Two domestic producers ceased operations altogether, and several others entered Chapter 11
bankruptcy proceedings. Id. (citing Staff Report at III-1 n.1). The adverse impact that subject
imports had on the domestic industry was also evidenced by employment and wage statistics; the
number of production-related workers, number of hours worked, and total wages paid all
declined throughout the POI. Id. (citing Staff Report at Table III-10). Finally, while total capital
expenditures increased between 1998 and 2000, expenditures on research and development
dropped. Id. (citing Staff Report at Table VI-8).

The industry's performance in the early portion of the POI reflected the adverse effects of
unfairly traded imports from Brazil, Japan, and Russia, but quarterly data indicated that domestic
producers had gained some benefit from the import relief imposed on those imports by mid-1999.
For a brief period, shipments and prices increased and the domestic industry's financial

performance improved, though prices generally remained below pre-injury levels.[12]  The

improvement did not last.  The order books at minimills peaked in the third quarter of 1999;

integrated mill order books peaked in the fourth quarter.  Id. at 36 (citing INV-Y-156).  Domestic

shipments to the merchant market and total domestic shipments peaked in the first quarter of

2000.  Id. (citing Staff Report at Table III-5).  Shipments to the merchant market, however,

declined by 7.8 percent from the first quarter of 2000 to the second.  In contrast, subject imports

rose from 1.2 million short tons in the first quarter of 2000 to 1.5 million in the second quarter.

Id. (citing Respondents' Joint Economic Prehearing Submission at Ex. 8).  In addition, subject

imports were generally underselling the domestic like product in second quarter 2000.  Id. at 36-

37 (citing INV-Y-148).  The record reflected that subject imports gained sales from the domestic

industry, largely through underselling, at a time when overall apparent domestic consumption

was still strong.  Id. at 37.

Although the industry's condition was also affected by a drop in apparent consumption at

the end of 2000, the Commission found that subject imports, which peaked in second quarter

2000, were the primary cause of the domestic industry's sharp drop in commercial shipments

through the third quarter of 2000.  This sharp decline preceded the general drop in demand for

_____

[12] For example, the value per ton of net domestic commercial sales fell to $292 in 1999, but reached $323 by the first quarter of 2000.  Id. at 34 (citing Staff Report at Table VI-1).  By the first quarter of 2000, operating income on commercial sales had changed from a $12 loss per ton for the year 1999 to a $16 per ton profit.  Id. at 34–35.  The value of total net production was $285 for 1999 but reached $314 per ton in the first quarter of 2000, and the net value of internal transfers and transfers to related parties for downstream processing was $282 in 1999 and $310 for the first quarter of 2000.  Id. at 35 (citing Staff Report at Tables VI-5 and VI-5A).  Finally, on total production, a loss of $11 per ton in 1999 shifted to a $5 profit in the first quarter of 2000, and operating losses on internal transfers and transfers to related parties for downstream processing were $22 per ton for the year 1999 and $1 per ton in the first quarter of 2000.  Id. (citing Staff Report at Tables VI-5 and VI-5A).

hot-rolled steel late in 2000. Id. at 36. Turning to the domestic industry's condition towards the

end of the POI, the Commission found that virtually every financial and production indicator was

lower in interim 2001 than in interim 2000, including shipments to the merchant market, total

shipments, operating income, the number of production related workers, and hours worked.[13] Id.

at 35–36. Operating losses affected 17 of 21 reporting firms in 2000, compared to only 12 firms

in 1998 and 13 firms in 1999, when imports from Brazil, Japan, and Russia were adversely

affecting the domestic industry. Id. (citing Staff Report at Table VI-5).

The Commission thus found that the subject imports had a significant adverse impact on

the domestic industry. Id. at 37. The record indicated that subject imports significantly increased

in volume and market share, undersold the domestic like product, and had a significant

suppressing and depressing effect on domestic prices throughout the POI. In addition, the

Commission found that low-priced subject imports contributed to the high level of purchaser

inventories that negatively affected the domestic industry for the remainder of the POI.[14] Id.

---

[13] Shipments to the merchant market in interim 2001 were 11.4 percent lower than in interim 2000. Id. at 35 (citing Staff Report at Table C-2). Total shipments were 16.5 percent lower in interim 2001 than in interim 2000. Id. (citing Staff Report at Table C-1). Operating loss per ton of net sales was $50 in interim 2001, compared to a positive income per ton of $16 in interim 2000. Id. (citing Staff Report at Table VI-1). Operating loss per ton of total production was $63 in interim 2001, compared to a positive income per ton of $5 in interim 2000. Id. (citing Staff Report at Table VI-5). The number of production related workers fell from 31,639 in interim 2000 to 29,123 in interim 2001. Id. at 36 (citing Staff Report at Table III-10). Hours worked were 16.3 million in interim 2001, compared to 18.2 million in interim 2000. Id.

[14] The Commission noted that though fewer than half of the responding purchasers were able to classify inventories by country of origin, the data indicated that subject imports did contribute to inventory growth. In the second quarter of 2000, purchaser inventories reached peak levels at the same time as subject import volume peaked, compared to a decline in domestic shipments to unrelated purchasers. Final Determination at 37 n.187 (citing Staff Report at V-13). Subject import volume held in purchaser inventories rose by 149.8 percent between 1998 and 2000, while reported total purchaser inventories only rose by 20.5 percent. Id. (citing Staff

Based on its findings on volume, price effects, and impact, the Commission determined that an industry in the United States is materially injured by reason of imports of hot-rolled steel products from India, Indonesia, South Africa, and Thailand that are subsidized and by imports of hot-rolled steel products from China, India, Indonesia, Kazakhstan, the Netherlands, Romania, Taiwan, Thailand, and Ukraine that are sold at LTFV. Id. at 38.

### D. Analysis

Corus claims that the Commission erred when it determined that subject imports were the cause of material injury to the domestic hot-rolled steel industry. Brief of Corus Staal BV and Corus Steel USA Inc. in Support of Rule 56.2 Motion for Judgment on the Agency Record at 7 (hereinafter "Corus Br."). Corus makes two alternative arguments. First, Corus claims that subject imports were not the cause of material injury to the domestic industry during the POI. See id. at 7–11. Second, Corus argues that even if domestic producers were injured by subject imports, the extremely limited duration of any alleged injury does not allow the ITC to make an affirmative finding of material injury. See id. at 11–12.

### 1. Injury from subject imports

Corus argues that contrary to the Commission's Final Determination, the record does not support its conclusion that the domestic industry suffered material injury by reason of subject imports. Instead, Corus claims that the record "clearly demonstrates" that the POI contained two commercially distinct time periods. Corus characterizes the period from 1998 through the second quarter of 2000 as period of economic expansion "marked by a robust economy with a

_____

Report at V-15). Finally, inventory data available indicated that subject imports accounted for only 4.9 percent of inventories in 1998 but made up 10.2 percent of significantly larger inventories by the end of 2000. Id.

resultant increase in shipments, prices, production, capacity utilization, and profitability." Corus

Br. at 8. Corus cites increasing demand as the cause of the increase in subject import volume and

market share during these years[15] and claims that the increase in domestic product shipments,

prices, and profitability undermines the Commission's conclusions on the price effects and

impact of subject imports on the domestic industry. Id. at 9.

Responding to particular factual findings in the Commission's impact analysis, Corus

argues that it was the domestic producers' "series of aggressive price increases," not lower-priced

subject imports, that prompted service centers and other inventory-holding purchasers to build

their stocks before expected future price increases.[16] See id. at 8, 10 (citations omitted).

Furthermore, Corus claims that the decrease in production-related employees, hours worked, and

wages paid during this period "can only be interpreted as the result of increased efficiency on the

---

[15] But see supra nn.10–11 and accompanying text. Corus acknowledges that the Commission's pricing data indicated margins of underselling by subject imports during this period, but Corus contests the ITC's conclusions regarding underselling because the data only included coverage for 13.3 percent of Dutch imports. Corus Br. at 9 & n.3. Corus fails to point out, however, that the coverage data in the Staff Report was derived from data submitted by respondents, i.e., Corus Staal BV and other foreign producers, in response to the Commission's questionnaires. See Staff Report at V-16–V-17. Furthermore, based on this same data the Commission also recognized overselling by subject imports, including Dutch imports, beginning in the second half of 2000. See Corus Br. at 9 n.3 (citing Final Determination at 21 and 25). Corus does not contest those conclusions, however, but instead relies upon the Staff Report's data on overselling to support several of its arguments on appeal. See Corus Br. at 5.

The Commission must make its decisions based on the information available, and because the limited coverage for Dutch imports is directly attributable to Corus itself, Corus's challenge to the representativeness of the ITC's pricing data is without merit.

[16] Corus claims that imports were not the cause of the build-up of inventories from 1999 to mid-2000 because the record demonstrated that such purchasers bought "primarily . . . domestically produced inventory." Corus Br. at 11. The inventory data available to the Commission, however, indicated that subject imports did contribute to the surge in inventory levels. See supra n.14.

part of the domestic industry and, therefore, further indicia of the health of the industry." Id. at 9

n.2. Therefore, Corus views the record as clearly demonstrating that the domestic industry was

not injured prior to the second half of 2000. Id. at 9.

Corus characterizes the second time frame, from the third quarter of 2000 to the end of

the POI, as a period of "significant contraction in the U.S. economy" that was marked by a sharp

decline in U.S. demand for hot-rolled steel products that resulted in corresponding declines in

apparent consumption,[17] production, domestic and import shipments, prices, and increases in

inventory. Id. at 8, 10. Corus claims that subject import volumes had fallen sharply and that

subject imports oversold domestic products before the declines in prices and demand began in

the second half of 2000, and that therefore imports "could not possibly account for any

continuing adverse effects." Id. at 10 (citing Final Determination, USITC Pub. 3446, at C-5).

The court's role is limited to reviewing the Final Determination to determine whether the

Commission's findings are supported by the evidence and the reasonable inferences therefrom.

See Daewoo Elecs. v. Int'l Union, 6 F.3d 1511, 1520 (Fed. Cir. 1993). The "substantial

evidence" standard of review only requires the court to find "such relevant evidence as a

reasonable mind might accept as adequate to support [the Commission's] conclusion." Universal

Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (internal citations and quotations omitted).

Substantial evidence is "something less than the weight of the evidence, and the possibility of

drawing two inconsistent conclusions from the evidence does not prevent the administrative

agency's findings from being supported by substantial evidence." Timken Co. v. United States,

---

[17] Apparent consumption declined 20.6 percent between the first quarter of 2000 and the first quarter of 2001. Corus Br. at 10 (citing Final Determination, USITC Pub. 3446, at IV-6).

166 F. Supp. 2d 608, 613 (Ct. Int'l Trade 2001) (quoting Consolo v. Fed. Mar. Comm'n, 383

U.S. 607, 620 (1966) (citations omitted)).  Furthermore, "it is not the province of the courts to

. . . reweigh or judge the credibility of conflicting evidence."  Chung Ling Co. v. United States,

16 CIT 636, 648, 805 F. Supp. 45, 55 (1992).  The court cannot substitute its judgment for that of

the Commission.  Goss Graphic Sys., Inc. v. United States, 22 CIT 983, 1008–09, 33 F. Supp. 2d

1082, 1104 (1998), aff'd, 216 F.3d 1357 (Fed. Cir. 2000) (citations omitted).

With these principles in mind, there is substantial evidence in the record to support the

ITC's finding of present material injury by reason of subject imports.  The court finds that there

is substantial evidence supporting the ITC's conclusions on the significance of subject import

volume.  Subject import volume increased by 203.4 percent from 1998 to 2000.  Contrary to

Corus's arguments, subject imports continued to enter the domestic market in large volumes well

into the third quarter of 2000.  Based on the record data, it was reasonable for the Commission to

conclude that such an increase over the POI was significant both in absolute terms and relative to

consumption in the United States.  See supra Part I.A.

The court also finds that the ITC reasonably concluded that subject imports had a

significant suppressing or depressing effect on domestic prices.  The existence of price increases

in late 1999 and early 2000, which occurred after import relief was imposed against nonsubject

imports, is not incompatible with a finding of price suppression or depression.  See Encon Indus.,

Inc. v. United States, 16 CIT 840, 842–43 (1992).  The significant increase in subject import

volume, persistent and significant underselling by those subject imports, and the limited nature of

the price recovery of domestic hot-rolled steel all occurred during the same time period.  Later in

the POI, prices fell sharply due to continued high volumes of low-priced subject imports.

Therefore, the Commission's conclusion that subject imports suppressed and depressed domestic prices was reasonable and supported by substantial evidence. See supra Part I.B.

The Commission's impact findings are also reasonable and based upon substantial evidence in the record. Contrary to Corus's view of the evidence, the surge of subject imports had adverse effects on the domestic industry well before mid-2000. As noted previously, the record reflected a sharp increase in subject import volume and market share, underselling by subject imports of the domestic like product, and significant price effects throughout the POI. The poor financial performance of domestic firms during the POI is undisputed; more than half reported operating losses on hot-rolled operations in 1998, and over 60 percent experienced reported losses in 1999 and 2000. These losses were sustained at a time when apparent domestic consumption was strong, but subject import volume was increasing and subject imports were pervasively underselling the domestic like product. Thus, the record contradicts Corus's assertion that the domestic industry was strong prior to mid-2000. Furthermore, virtually every financial and production indicator was lower in interim 2001 than in interim 2000, with 17 of 21 firms reporting operating losses on total hot-rolled steel operations in the first quarter. Losses continued throughout the later portion of the POI despite increases in domestic production and shipments because prices remained weak. Finally, the record supports the ITC's finding that purchases of subject imports contributed to the significant inventory build-up in the first half of 2000 that exerted downward pressure on orders for the domestic like product later in the POI. See supra n.14. Accordingly, the Commission could reasonably have concluded that the subject imports had a negative impact on the domestic hot-rolled steel industry, despite some positive indicators of the industry's condition. See supra Part I.C.

In conclusion, the Commission's findings on the significance of subject import volume, price effects, and overall impact of subject imports in the U.S. market are reasonable and supported by substantial record evidence. Corus's challenge to the material injury determination essentially is asking the court to reweigh the record evidence and substitute its judgment for that of the Commission, which the court clearly cannot do. The Commission, having found that changes in subject import volume, price effects, and impact were related to the pendency of the investigation, acted within its discretion in discounting post-petition data. See 19 U.S.C. § 1677(7)(I). The court therefore holds that the ITC's material injury determination is supported by substantial evidence and is otherwise in accordance with law.

## 2. Limited duration of injury

Alternatively, Corus urges the court to find that an affirmative injury determination is precluded by the limited duration of any alleged injury. Corus Br. at 11. Corus again asserts the health of the U.S. industry from 1998 to 2000, pointing to positive trends in key performance indicators such as capacity, actual production, and capacity utilization. Id. (citing Staff Report at Table III-3). Based on those positive trends in early 2000, and subsequent signs of recovery in indicators such as production and volume[18] in the fourth quarter of 2000, Corus asserts that any

---

[18] Corus asserts that the domestic industry experienced "significant recovery" in volume in late 2000, and points out that shipments of domestic product rose 13% between the fourth quarter of 2000 and the first quarter of 2001. Corus Br. at 12 (citing Staff Report at Table III-5). Although the domestic industry did show a slight degree of recovery in volume levels between the fourth quarter of 2000 and the first quarter of 2001, quarterly data on the domestic industry's total shipments reveal an overall decline in the quantity and value of total shipments from the first quarter of 2000 to the first quarter of 2001. Staff Report at III-8–III-9. The industry shipped 18,154,595 short tons in first quarter 2000, 17,120,222 shorts tons in second quarter 2000, 16,338,517 short tons in third quarter 2000, 14,181,850 in fourth quarter 2000, and 15,097,920 in first quarter 2001. Id. at Table III-5. Based on these figures, it puzzles the court how Corus can claim that U.S. producers began to see "significant recovery" in volume in late 2000 when

minimal adverse effect from subject imports could only be present for a limited duration in 2000.

Id. at 11–12. Corus concludes, "Given the brevity of any arguable injury caused by imports—at

most several months—there was insufficient basis for a finding of present material injury." Id. at

12 (citing Bjelland Seafoods v. United States, 16 CIT 945, 955–56 (1992) and Saarstahl AG v.

United States, 18 CIT 595, 600, 858 F. Supp. 196, 200 (1994)). The court rejects this argument,

however, for the same reasons it discussed supra in affirming the Commission's material injury

determination. The injury suffered by the domestic industry was not as limited in nature as

Corus suggests, and there is substantial evidence supporting the Commission's findings to the

contrary.

## II. CUMULATION OF DUTCH IMPORTS WITH OTHER SUBJECT IMPORTS

The Commission, in the course of making its material injury determination, is required to

cumulatively assess the volume and effect of imports from two or more countries subject to

investigation if such imports compete with each other and with domestic like products in the U.S.

market. 19 U.S.C. § 1677(7)(G)(i). "This analysis recognizes that a domestic industry can be

injured by a particular volume of imports and their effects regardless of whether those imports

come from one source or many sources." Uruguay Round Agreements Act, Statement of

Administrative Action, H.R. Doc. No. 103-316, at 847 (1994), reprinted in 1994 U.S.C.C.A.N.

4040; see Bingham & Taylor Division v. United States, 815 F.2d 1482, 1485 (Fed. Cir. 1987).

The ITC must find only a "reasonable overlap of competition" between the subject imports from

---

shipments actually decreased by a significant degree between the third and fourth quarters of that
year. Furthermore, though volume did rise somewhat between fourth quarter 2000 and first
quarter 2001, 2001 shipments were markedly below volume levels for the first quarter of 2000.
See id.

different countries before the mandatory cumulation provision applies. Goss, 22 CIT 983, 984, 33 F. Supp. 2d 1082, 108 (1998) (quoting Wieland Werke v. United States, 13 CIT 561, 563, 718 F. Supp. 50, 52 (1989)).

The Commission has an established framework for assessing whether there is a reasonable overlap of competition that involves the consideration of the following four factors: (1) the degree of fungibility (or substitutability) between the products, including consideration of specific customer requirements and other quality related questions; (2) the presence of sales or offers to sell in the same geographic markets; (3) the existence of common or similar channels of distribution; and (4) the simultaneous presence of subject imports in the market. Final Determination at 13; see Wieland Werke, 13 CIT at 563, 718 F. Supp. at 52. The Commission's framework for analysis has been approved by the court on numerous occasions. See, e.g., Goss, 22 CIT at 988, 33 F. Supp. 2d at 1089; Fundicao Tupy S.A. v. United States, 12 CIT 6, 10–11, 678 F. Supp. 898, 902, aff'd, 859 F.2d 915 (Fed. Cir. 1988). These factors are not exhaustive, no single factor is determinative, and completely overlapping markets are not required. See Wieland Werke, 13 CIT at 563, 718 F. Supp. at 52 (citations omitted).

In analyzing the four cumulation factors in the present case, the Commission found that there was a reasonable overlap of competition among the subject merchandise from all countries subject to investigation and between subject imports and the domestic like product. Final Determination at 19. In evaluating fungibility, the ITC found that the record evidence indicated a moderate level of substitutability between domestic and imported hot-rolled steel products and subject imports. Id. at 14. The Commission found geographic overlap among the subject imports and the domestic like product and determined that the subject imports and domestic

products moved in similar channels of distribution. See id. at 16–18. Finally, domestic products and subject imports were simultaneously present in the market. See id. at 18–19. Therefore, the Commission cumulated subject imports from all subject countries for the purpose of determining whether the domestic industry was materially injured by reason of subject imports. Id. at 19.

Corus raises a number of challenges to the Commission's cumulation determination. Corus claims that the finding on fungibility of Dutch imports was incorrect and disputes the findings of simultaneous presence and geographic overlap. Corus further contends that the Commission should have given more weight to the channels of distribution factor in its cumulation analysis because, in Corus's view, it was the primary focus of petitioners' injury allegations. Finally, Corus forcefully contests the Commission's finding that Dutch imports move in similar channels of distribution with other subject imports and the domestic like product.

### A. Channels of Distribution

Corus first claims that the Commission should have focused its cumulation analysis on one of the traditional four factors, channels of distribution,[19] because it was the "primary focus of the petitioners' injury allegations" and "[t]he concept of an inventory overhang was critical to the

---

[19] According to Corus, channels of distribution may, in certain circumstances, outweigh the other three factors. Corus Br. at 15. Each of the cases cited by Corus, however, is distinguishable from the instant case. In two of the investigations, the Commission actually determined to cumulate despite differences in channels of distribution. See Honey from Argentina and China, USITC Pub. 3470, Inv. Nos. 701-TA-402 and 731-TA-892-893 (Nov. 2001) (final determ.) and Stainless Steel Angle from Japan, Korea, and Spain, USITC Pub. 3421, Inv. No. 731-TA-888-890 (May 2001) (final determ.). In two other cases, the Commission did decline to cumulate imports, but in both cases the differences in channels of distribution also reflected differences in products. See Ferrosilicon fom Egypt, USITC Pub. 2688, Inv. No. 731-TA-642 (Oct. 1993) (final determ.) and Certain Preserved Mushrooms from China, India, and Indonesia, USITC Pub. 3159, Inv. No. 731-TA-777-779 (Feb. 1999) (final determ.).

Commission's material injury determination." Corus Br. at 16. However, both the petitioners

and the ITC recognized that imports for inventory were only one source of material injury

suffered by the domestic industry. This is clear from the court's review of the ITC's material

injury determination supra Part I. Furthermore, the Commission's cumulation methodology of

considering each of the traditional four factors is settled practice and, as indicated, has been

approved by the court on numerous occasions. Corus's argument that the Commission should

have altered its methodology to comport with Corus's particular theory of causation, a theory that

erroneously isolates one of many factors actually relied upon by the ITC in finding material

injury in these investigations, is therefore without merit.

Corus next challenges the Commission's decision to cumulate subject imports from the

Netherlands with other subject imports by claiming that its products did not move in similar

channels of distribution as the domestic like product or other subject imports. The Commission

found that slightly more than half of all commercial shipments of the domestic like product and

approximately two-thirds of all commercial shipments of subject imports went to distributors,

processors, or service centers in the year 2000. Final Determination at 17. Similarly, a

substantial amount of subject imports from the Netherlands were sold to distributors, processors,

and service centers.[20] Id. at 18. Corus tried to distinguish its service center and distributor sales

on the ground that it knew who the final purchaser would be, but the record before the

Commission showed that a significant portion of all subject imports were for a known final end

---

[20] The record indicated that about [                    ] of subject imports from the
Netherlands were sold to distributors, processors, or service centers, as were 53.7 percent of all
domestic commercial shipments and 67.3 percent of all subject imports. Final Determination at
18; Staff Report at Table I-1.

user,[21] even when distributors or service centers were involved in the transaction.[22]  Id.  Thus,

although the Commission considered Corus's claims regarding the uniqueness of its distribution

channel, it nevertheless found that substantial evidence on the record that indicated that subject

imports from the Netherlands, other subject imports, and the domestic like product did compete

for sales in similar channels of distribution.  The court agrees.

## B.  Other Factors

### 1.  Fungibility

Corus claims that it is a niche supplier that does not provide highly fungible, commodity

grade products. That fact, according to Corus, severely limits its competition with other

suppliers.  Corus Br. at 27.  In rejecting this claim, the Commission found at least a moderate

---

[21] The Commission found that [     ] percent of subject imports from the Netherlands were sold directly to end users.  Similarly, about a third of all subject imports and over 45 percent of commercial shipments of hot-rolled steel from domestic producers were sold directly to end users.  Manufacturers of pipes and tubes were the major purchasers of hot-rolled steel from all sources.  Staff Report at Table I-1.
    Corus challenges the sufficiency of the evidence on the ITC's finding that a significant portion of all subject imports were prepared for a known final customer because it claims that the other producers of subject imports did not submit "sufficiently detailed data" and because the record contained some evidence to contradict the Commission's finding.  The mere existence of contradictory evidence, however, does not invalidate the Commission's determination or require remand.  BIC Corp. v. United States, 21 CIT 448, 451, 964 F. Supp. 391, 396 (1997) (citations omitted).  Furthermore, "the choice between two possible conclusions is properly the task of the Commission, and not the court."  Id.  The court therefore declines to substitute Corus's evaluation of the evidence for that of the Commission.

[22] Although Corus claims that there is not enough evidence for the Commission's conclusion, the record shows the contrary.  Purchasers were asked if they placed orders prior to the manufacture of hot-rolled steel or bought from inventory.  One purchaser reported buying from inventory, 19 reported placing orders prior to manufacture, and 6 reported using both methods.  Furthermore, reports by respondents from China, Indonesia, South Africa, and Thailand, as well as the Netherlands, indicated that "virtually all of their exports are pre-sold prior to entry." Staff Report at II-18.  Thus, Corus's distribution methods are not as different from those used by other producers, foreign and domestic, as Corus suggests.

level of substitutability between domestic and imported hot-rolled steel products generally[23] and, in the specific case of the Netherlands, the Commission found that [            ] of Dutch imports were fungible with the domestic like product and with other subject imports. Final Determination at 15–16. The court finds that the Commission considered Corus's argument on this issue and gave a reasonable explanation for its finding that Dutch products were fungible with other subject imports and the domestic like product. Therefore, the ITC's fungibility finding is sustained.

### 2. Geographic overlap and simultaneous presence

Corus points to the limited nature of its customer base to refute any finding that it sells in the same geographic market as other subject imports and the domestic like product and that its products are simultaneously present in the market. Corus claims that, because it only has a few long-standing customers and does not actively solicit new customers, it is not "out in the market." Corus Br. at 27. In evaluating geographic overlap and simultaneous presence in the market, the ITC must make a determination that subject imports and the domestic like product are competing for sales at similar times and in similar places. See Mukand Ltd. v. United States, 20 CIT 903, 907–10, 937 F. Supp. 910, 915–17 (1996). The evidence in the record clearly shows that subject imports from the Netherlands, other subject imports, and the domestic like product were both widely available throughout the POI and were offered for sale in a variety of

---

[23] Domestic producers find subject imports to have a [          ] of interchangeability, and importers also find a [                 ] of fungibility. Final Determination at 14 (citation omitted). Also, purchasers generally agreed that imported and domestically-produced steel are used in the same applications, and they specifically identified Dutch product as being used in the same applications as the domestic like product. Id. (citing Staff Report at II-17).

overlapping locations.[24]  See Final Determination at 14–19.  The ITC's findings on these factors

are therefore reasonable and supported by substantial record evidence.

### C. Conclusion

Like Corus's arguments regarding the ITC's material injury determination, Corus's

challenge to the Commission's decision to cumulate imports from the Netherlands with other

subject imports amounts to no more than a request for the court to reweigh the evidence in

Corus's favor.  As stated previously, the Court cannot substitute its judgment for that of the

Commission.  The ITC fully evaluated Corus's various claims and challenges to cumulation at

the administrative level, and the record contains substantial evidence to support the

Commission's finding that a reasonable overlap of competition existed between subject imports

from the Netherlands, other subject imports, and the domestic like product.  Therefore, the court

sustains the Commission's decision to cumulate Dutch imports with other subject imports in

conducting its material injury analysis.

### III. CAUSATION

Corus argues that even if Dutch subject imports were properly cumulated with other

subject imports, Commission was required to make a separate causation determination with

respect to Dutch imports. Corus Br. at 28 (citing BIC Corp. v. United States, 21 CIT 448, 964 F.

---

[24] Regarding geographic overlap, the Commission specifically found that the domestic like product was marketed and sold throughout the entire U.S. market.  Also, while some of the subject imports may have entered the United States through different regions, the Commission concluded that at some point during the POI some portion of subject imports from most countries entered every region.  Id. at 16–17.  Regarding simultaneous presence in the market, the Commission found that the domestic product was available troughout the POI and that subject imports from every country entered the U.S. market during every year of the POI.  Id. at 18–19.

Supp. 391 (1997) and <u>Comm. of Domestic Steel Wire Rope & Specialty Cable Mfrs. v. United</u>

<u>States</u>, 201 F. Supp. 2d 1287 (Ct. Int'l Trade 2002)).  Corus advances five arguments against a

finding of material injury caused by Dutch products imported into the domestic market.[25]  The

court, however, finds this line of argument unpersuasive.  The cases Corus cites to support its

contention are inapposite.  In both, the court merely recognized that notwithstanding an

affirmative cumulation finding, the Commission is permitted to make a negative causation

finding regarding the effect of cumulated imports on the volume and price of the domestic like

product, in addition to their impact on the domestic industry.  <u>Wire Rope</u>, 201 F. Supp. 2d at

1298–99; <u>BIC</u>, 21 CIT at 452–53, 964 F. Supp. at 397–98.  Nothing in either case suggests that a

separate causation finding for a subject country that has been cumulated would be permissible

under the statute, let alone required.

In addition, although Corus would limit the import of the statutory language, a separate

causation analysis would violate the plain language of the cumulation statute, which provides

that, in conducting its material injury analysis, "the Commission shall <u>cumulatively</u> assess the

volume and effects of imports of the subject merchandise <u>from all countries</u> . . . if such imports

compete with each other and with the domestic like products in the United States market." 19

U.S.C. §1677(7)(G)(i) (emphasis added).  This leaves no room for a separate causation analysis.

---

[25] First, Corus states that Dutch subject imports generally sold at or above domestic prices for sales to service centers, distributors, and end users during the POI.  Second, Corus argues that nothing in the record demonstrates that U.S. producers lost sales or revenue to Dutch imports.  Corus's third argument is that product differentiation creates attenuated competition between Dutch and domestic producers.  Fourth, Corus maintains that Dutch import have had no adverse effect of the volume of sales in the domestic market.  Finally, Corus argues that Commerce's determination on the margin of dumping does not establish material injury.  Corus Br. at 29–39.

Finally, this court has specifically rejected the argument that "imports from each country under investigation must be found to have a separate causal link to the material injury suffered by the pertinent U.S. industry before they can be assessed cumulatively" as "circular reasoning" that conflicts with both the statute and its legislative history. Fundicao Tupy, 12 CIT at 9, 678 F. Supp. at 901. In Fundicao Tupy, the court held that the operation of the cumulation provision does not involve a separate causation finding with respect to each country because it implicates the imports of each country in the general pattern of activity that is causing injury to the domestic industry. Id. at 10, 678 F. Supp. at 902. This interpretation of the interplay between cumulation and causation was affirmed by the U.S. Court of Appeals for the Federal Circuit. Fundicao Tupy, 859 F.2d at 917. In light of this longstanding and binding precedent contrary to Corus's position, the court declines to address Corus's arguments regarding whether Dutch imports individually caused material injury to the domestic industry.

**CONCLUSION**

For the foregoing reasons, the court denies Corus's Motion for Judgment Upon the Agency Record and sustains the ITC's material injury determination.

_____
Jane A. Restani
Judge

DATED: New York, New York

This 21st day of March, 2003.